**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

|  |  |
|---|---|
| In re:<br><br>ULTIMATE NUTRITION, INC. AND<br>PROSTAR, INC. | ) <br>) Chapter 11<br>) <br>) Case No. 14-22402<br>) Case No. 14-22403<br>) (Joint Administration Pending) |

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, AND (II) AUTHORIZING AND APPROVING GRANT OF ADEQUATE PROTECTION**

Ultimate Nutrition, Inc. ("Ultimate Nutrition") and Prostar, Inc. ("Prostar"), as debtors and debtors in possession (collectively, the "Debtors"), by this motion (the "Motion"), respectfully seek the issuance and entry of an interim order (the "Interim Order") and a final order (the "Final Order") for authority to, among other things, (i) pursuant to section 363 of Title 11 of the U.S. Code (the "Bankruptcy Code"), use, subject to certain terms and conditions, cash collateral within the meaning of section 363(a) of the Bankruptcy Code in which T.D. Bank, N.A. ("TD") has a perfected first priority security interest ("Cash Collateral"), and (ii) provide adequate protection under sections 361 and 363 of the Bankruptcy Code on account of such use.

In support of this Motion, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. By this Motion, the Debtors seek authority to use Cash Collateral in which TD asserts a secured interest.

2. As described in greater detail below, the Debtors have an immediate need to use Cash Collateral. In particular, the Debtors must use the Cash Collateral to continue as a going concern postpetition. If the Debtors are unable to pay in the ordinary course, among other

things, their employees, suppliers, utilities and landlords, the Debtors will be forced to cease operations and convert their cases to Chapter 7.

3. The Debtors' business is profitable. In 2013, the Debtors generated in excess of $2 million in EBITDA and, as established in the Budget, attached hereto as Exhibit A (the "Budget"), the Debtors expect to continue to operate on a cash positive basis. While the constituencies disputes are resolved in these cases, it is in all parties' best interest to preserve the Debtors' business as a going concern.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of this Motion pursuant to 28 U.S.C.A. §§ 1334 and 157. Venue of the Debtors' Chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C.A. §§ 1408 and 1409. Consideration of the Motion constitutes a core proceeding under 28 U.S.C.A. § 157(b)(2). The statutory predicates for the relief sought herein are Sections 105, 361, 363 and 507 of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTS

A. Introduction

5. On December 17, 2014 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Clerk of this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order consolidating, for procedural purposes only, the Debtors' Chapter 11 cases and for joint administration of these Chapter 11 cases.

6.     No trustee or examiner has been appointed in the Debtors' Chapter 11 cases, nor has any creditors' or other official committee been appointed herein pursuant to Section 1102 of the Bankruptcy Code.

   B. <u>Debtors' History and Business</u>

7.     Ultimate Nutrition is engaged in the development, sale and distribution of high quality nutritional supplements for bodybuilding, enhanced athletic performance and fitness. Prostar functions as the production segment of the Debtors' business by processing and packaging many of the products sold by Ultimate Nutrition, which is Prostar's only customer.

8.     The Debtors operate their business from two facilities located in Farmington, Connecticut, one product distribution center in New Britain, Connecticut and a research and development center in West Palm Beach, Florida. The Debtors, collectively, have approximately 200 employees.

9.     Ultimate Nutrition's products are sold nationally and worldwide in over 100 countries. Since Ultimate Nutrition was founded in 1979 by the late Victor H. Rubino, one of the top amateur power lifters in the United States at that time and also a biochemist, the Debtors' corporate mission and business ethos has been the development, production and sale of high quality, thoroughly researched nutritional and dietary supplements that are safe, effective, affordable and regulatory-compliant.

10.    The Debtors have been and remain industry leaders by producing and offering products that are known for their rigorous research and quality standards. Over the years, Ultimate Nutrition has sponsored many well-known athletes and celebrities and, from 2009 to the present, has been the title sponsor of the Mr. Olympia bodybuilding contest, which became prominent after helping launch the career of Arnold Schwarzenegger.

11. The Debtors are operationally sound and historically, have operated at a profit. More recently, the Debtors, on a consolidated basis, generated net income of $500,000 on gross sales of $44.6 million in 2013, net income of $2.6 million on gross sales of $51.5 million in 2011 and net income of $1.4 million on gross sales of $48 million in 2010. In the year 2012, which was an aberration, the Debtors suffered a loss of $1 million on gross sales of $47 million, primarily as a result of millions of dollars of one-time temporary labor charges incurred due to labor strife and onerous regulatory requirements.

C. The Debtors' Secured Indebtedness

12. Prepetition Credit Facility. The Debtors are indebted to TD pursuant to the following loan agreements and other documents and for the following amounts:

(a) a Revolving Credit and Term Loan Agreement entered into on January 20, 2012 (the "Loan Agreement") by and between Ultimate Nutrition as borrower, Prostar and others as guarantors and TD as lender, providing for a revolving loan in the original principal amount of $10 million, evidenced by a Revolving Credit Note dated January 20, 2012 from Ultimate Nutrition to TD in the original principal amount of $10 million, all as amended by a Loan Modification Agreement dated January 13, 2014 and an Amended and Restated Revolving Note dated January 13, 2014 from Ultimate Nutrition to TD (collectively, the "Revolving Loan"). The Revolving Loan has been unconditionally guaranteed by Prostar and certain other related parties. As of the Petition Date, the amount of approximately $8,007,000 was due and owing on account of the Revolving Loan.

(b) A Term Loan pursuant to the Loan Agreement by and between Ultimate Nutrition as borrower, Prostar and others as guarantors and TD as lender, in the original

4

principal amount of $5 million, evidenced by a Term Note dated January 20, 2012 from Ultimate Nutrition to TD in the original principal amount of $5 million, all as modified by a Loan Modification Agreement between the parties dated January 13, 2014 (collectively the "Term Loan").  The Term Loan has been unconditionally guaranteed by Prostar and other related parties.  As of the Petition Date. the amount of approximately $2,417,000 was due and owing on account of the Term Loan.

       (c)     An Export Revolving Line of Credit facility entered into on March 17, 2009 by and between Ultimate Nutrition as borrower and TD as lender, in the original principal amount of $1,750,000, as evidenced by an Export Revolving Loan Promissory Note dated March 17, 2009 in the original principal amount of $1,750,000, as amended by an Amended and Restated Export Revolving Loan Promissory Note dated January 20, 2012 in the original principal amount of $2,500,000, all as further amended by a Loan Modification Agreement dated January 13, 2014 by and between Ultimate Nutrition as borrower, Prostar and others as guarantors and TD as lender (the "EXIM Loan").  The EXIM Loan has been guaranteed by Prostar and other related parties.  As of the Petition Date, the amount of approximately $1,662,000 was due and owing on account of the EXIM Loan.

       (d)     An Equipment Line of Credit entered into November 8, 2011 by and between Ultimate Nutrition as borrower and TD as lender in the original principal amount of $1.6 million, as evidenced by a Equipment Line of Credit Promissory Note dated November 8. 2011 from Ultimate Nutrition to TD in the original principal amount of $1.6 million, all as amended by a Loan Modification Agreement between the parties dated January 13, 2014 (the "Equipment Loan").  The Equipment Loan has been

5

unconditionally guaranteed by Prostar and other related parties. As of the Petition Date, the amount of approximately $1,084,000 was due and owing on account of the Equipment Loan.

(e) Unlimited Continuing Guaranty Agreements, each dated March 17, 2009, from Ultimate Nutrition, Prostar and other related parties, pursuant to which Debtors guaranteed the obligations of VHR Development, LLC ("VHR") to TD with respect to a promissory note in the original principal amount of $1.5 million from VHR to TD, which is secured by a mortgage in the same amount against real property located at 7 Corporate Avenue, Farmington, Connecticut and which is used by the Debtors as their place of business (the "Corporate Avenue Property"). As of the Petition Date, the amount of approximately $1,258,000 was due and owing on account of VHR's note and mortgage to TD.

13. The foregoing obligations of the Debtors as described in ¶ 8 hereof are hereinafter referred to as the "TD Prepetition Obligations." The TD Prepetition Obligations are secured by valid and duly perfected security interests (the "TD Prepetition Liens") in all of Debtors' personal property existing as of the Petition Date (the "TD Prepetition Collateral"). The TD Prepetition Obligations that are described in ¶12(a)-(d) above are the subject of unconditional guarantees by Prostar and non-debtors, Elizabeth Rubino, Brian Rubino, VHR Development, LLC.

D. Events Leading to the Commencement of the Chapter 11 Cases

14. In early 2012, the Debtors expanded their lending relationship with TD by taking out an equipment loan, terming out a portion of the debt on their line of credit, and increasing the availability on the line of credit. Prior to expanding their debt structure with TD, the Debtors

6

explained to TD that due to increased regulatory enforcement activity and labor strife experienced in 2011, 2012 would be a rebuilding year for the Debtors and that TD should not expect the same financial results from the Debtors as in the past. TD went along with the 2012 debt expansion nonetheless.

15.     The Debtors first experienced strife with TD after they hired a Chief Financial Officer who was highly recommended for them by their loan officer at TD. Shortly thereafter, it was discovered that the individual hired was grossly incompetent and engaged in sexual harassment and other inappropriate behavior. As a result, he was terminated. Since that time, the Debtors' relationship with TD deteriorated.

16.     In 2013, TD placed the Debtors in default due to non-compliance with certain financial covenants in the loan documents (even though the Debtors had not missed a single payment to TD on any of their loan facilities) and transferred the lending relationship to the workout division of the bank.

17.     Since being transferred to loan workout, the Debtors have been subjected to onerous financial, reporting and other demands by TD, including the demand that the Debtors arrange for a refinancing of TD's entire indebtedness in the approximate amount of $13 million, under threat of enforcement action by TD. Although the parties entered into several forbearance agreements, at a substantial cost to the Debtors, while the Debtors were searching for refinancing sources, the latest one expired on December 15, 2014. During that entire period of time, the Debtors made all loan and other payments that were required by TD.

18.     The loan workout process and refinancing search imposed upon the Debtors by TD, as it has progressed, has created substantial instability, uncertainty and financial strain for

the Debtor's business and, as a result, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code.

    E. <u>The Debtors' Need for Use of Cash Collateral</u>

19. Given the purported encumbrances upon substantially all of the Debtors' assets, the Debtors will be unable to continue their business operations absent some form of immediate relief from this Court. Without immediate relief, the Debtors will be unable to fund the day-to-day operations that are essential to the Debtors' continued existence as a going concern to the detriment of their estates, To meet their ongoing financing needs, the Debtors seek Court authority to use their cash collateral, subject to the terms and conditions of the Motion, the Budget (as defined below), the Interim Order and the Final Order.

**RELIEF REQUESTED**

    A. <u>Relief Sought</u>

20. By this Motion, the Debtors seek the entry of the Interim Order, substantially in the form of that which is attached hereto as Exhibit "B" (the "Interim Order"), (i) authorizing the Debtors to use the "Cash Collateral," defined as any cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of the Debtors, subject to the terms and conditions of the Motion, the Interim Order and a Final Order and (ii) authorizing and approving grant of adequate protection on account of such use. Further, the Debtors seek the entry of a Final Order, after at least 14 days' notice of the Motion, in substantially the form of the Interim Order with such other or different terms and conditions as may be agreed to by the Debtors and TD or ordered by the Court.

21. Bankruptcy Rule 4001(b) requires a final hearing on a motion for authorization to use cash collateral to be held on no less than 14 days' notice. Rule 4001(b) permits the Court to

8

conduct a preliminary hearing, prior to the expiration of the 14-day period, to consider authorizing the Debtors to use that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the estate pending the final hearing.

22.  As indicated above, the Debtors will not have sufficient funds to cover the expenses that will accrue until a final hearing could be held on the Motion. Thus, without authorization to use Cash Collateral on an immediate basis, the Debtors would be forced to convert their cases to Chapter 7, which would cause irreparable harm to their estates.

23.  Accordingly, the Debtors are requesting that the Court exercise its authority to enter the Interim Order pursuant to Bankruptcy Rule 4001(b)(2). Entry of the Interim Order will not cause irreparable harm to interested parties, because such parties will be granted an opportunity to assert an objection to the Motion subsequent to the entry of the Interim Order (until approximately 14 days after service of the Motion). The Interim Order permits the interim use of Cash Collateral in accordance with the Budget (as defined herein) pending a final hearing which will be scheduled pursuant to the Interim Order.

B.  Terms

24.  The specific financial terms and conditions of the Debtors' proposed use of Cash Collateral are as set forth in the Interim Order.  The principal elements of the Interim Order are summarized as follows:

(a)  Use of Cash Collateral.  The Debtors will be permitted to make disbursements of Cash Collateral Account in their discretion, for the purpose of meeting the Debtors' cash needs from the date of entry of the Interim Order through January__, 2015 or such other date as may be ordered by the Court (the "Interim Period") provided that the amount of each disbursement shall not exceed the amounts specified in the

Budget for the Interim Period, substantially in the form of that which is attached hereto as Exhibit "A". The Debtors shall use the Cash Collateral solely to fund their ordinary course business operations, and at all times in accordance with the Budget. For each weekly period set forth in the Budget, the Debtors' actual cash disbursements for such period shall not exceed the line item amount for such category as set forth in the Budget, provided, however, that notwithstanding the foregoing, (i) expenditures of the Debtors under any line item of the Budget for any period may exceed the expenditure amount budgeted for such line item by 20%, so long as aggregate total expenditures during the term of this order do not exceed the total amount budgeted for such period, and (ii) any line item expenditures budgeted during any given week, but not actually paid or expended during such week, may be paid during the following week. In no event shall aggregate total expenditures by the Debtors for the Interim Period exceed the total expenditures for the Interim Period as set forth on the Budget, provided, however, that Debtors and TD may, in their sole discretion, agree to increase cash disbursements and operating expenditures in the Budget and upon written agreement by TD to so modify the Budget, Debtors will be authorized to use Cash Collateral in such amount without the need for any further order of the Court.

(b) <u>Replacement Liens</u>. As adequate protection for any Cash Collateral expended by the Debtors pursuant to the Interim Order, TD will receive, pursuant to §§ 361(1) and 363(e) of the Bankruptcy Code, a first lien (the "Replacement Liens") to secure an amount of TD's claims equal to (i) the amount of Cash Collateral actually expended by the Debtors; and (ii) an amount equaling the aggregate decline in the value of the TD Prepetition Collateral (subject only to nonavoidable, valid, enforceable and

10

perfected liens and security interests in the assets of Debtors, as prepetition debtors, that existed on the Petition Date and are not subject to avoidance pursuant to the Code, in favor of such third parties holding perfected liens or security interests which are superior in priority, after giving effect to any existing subordination or intercreditor arrangements, to TD's security interests in and liens on the assets of Debtors, as prepetition debtors), on all personal property and assets of the Debtors, of any kind or nature whatsoever, whether now owned or hereafter acquired by any Debtors, and all proceeds, rents or profits thereof (collectively, the "DIP Collateral").

(c) <u>Superpriority Administrative Claim</u>. TD shall have an allowed administrative expense claim in an amount equal to the amount of Cash Collateral actually expended by Debtors pursuant to this Order, which claim shall have the highest administrative priority under Sections 503(b), 507(a)(1) and 507(b) of the Code (the "Super-Priority Claim"), and such claim shall have priority over, and be senior to, all other administrative claims.

(d) <u>Professional Fees</u>. Notwithstanding anything to the contrary, the Replacement Liens and priority claims granted to TD pursuant to the Interim Order shall be subject and subordinate to the payment of the following (to the extent that there are not sufficient, unencumbered funds in Debtors' estates to pay such amounts at the time payment is required to be made and, in the case of Debtor Professionals (as defined below), to the extent that such Debtor Professionals do not have an adequate cash security deposit or retainer balance on hand): (a) compensation and expense reimbursement (collectively, "Professional Expenses") of Pullman & Comley, LLC, as prospective attorneys for Debtors, Marcum, LLP, as prospective accountants and tax and

11

financial advisors for the Debtors, and Laquerre Michaud, LLC, as prospective accountants and bookkeeping advisors for the Debtors (the "Debtor Professionals"), to the extent that such Professional Expenses, (i) were incurred on or after the Petition Date and prior to the earlier to occur of end of the Interim Period, (ii) are approved for payment by a final order of the Court, after notice and a hearing, or pursuant to an administrative procedure established by Court order, and (iii) do not exceed, without the prior written consent of TD, in the aggregate as to all amounts paid or to be paid post-petition, the sum of $100,000, plus any retainer held by the Debtor Professionals on the Petition Date; (b) quarterly fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C.A. § 1930(a)(6); and (c) any unpaid wages owed by the Debtors (collectively, the "Carve-Out"); provided, however, that no Cash Collateral and no amounts received pursuant to the Carve-Out shall be used by any person or entity to pay Professional Expenses incurred in connection with any attempt to invalidate, set aside or subordinate the TD Prepetition Indebtedness, the TD Prepetition Liens or the Replacement Liens.

(e)     Reporting.  Each week for the duration of the Interim Period, by the Wednesday following the end of each such week, the Debtors shall provide TD with: (i) a written accounting of (A) all Cash Collateral in their possession, custody or control, and (B) any Cash Collateral expended and the purposes for which it was expended pursuant to the Interim Order; and (ii) an updated borrowing or collateral base certificate, consistent with the format provided by Debtors to TD prior to the Petition Date.

(f)     Default.  A failure by the Debtors to comply with any provisions of the Interim Order, which failure is not remedied within thee business days of Debtors' receipt

12

of written notice of such failure, shall automatically terminate the Debtors' authority to use or spend any further Cash Collateral without (i) further order of this Court and (ii) notice and the opportunity to be heard by TD at a hearing prior to granting of such order,

(g) <u>Stipulation by the Debtors</u>. The Debtors stipulate that the security interests and liens granted to TD pursuant to the documents evidencing and securing the TD Prepetition Indebtedness constitute valid and perfected first priority security interests and liens, not subject to avoidance or subordination under the Bankruptcy Code or applicable nonbankruptcy law. However, the Interim Order does not preclude any creditor, a Creditors' Committee or any subsequently appointed trustee from objecting to or otherwise challenging the validity or amount of the TD Prepetition Indebtedness or the extent, validity or perfection of TD's prepetition liens upon and security interests in the TD Prepetition Collateral.

C. <u>The Lender' Interests Are Adequately Protected</u>

25. Where a debtor has proposed to use cash collateral, the Court, pursuant to section 363(c) of the Bankruptcy Code, may permit the use of cash collateral so long as the debtor provides "adequate protection of such interest" in accordance with section 361 of the Bankruptcy Code. Section 361 of the Bankruptcy Code sets forth three nonexclusive examples of adequate protection. Adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." <u>In re Mosello</u>, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting <u>In re Beker Industries Corp.</u>, 58 BR 725, 736 (Bankr. S.D.N.Y. 1986)). <u>See</u> also <u>Bluebird Partners, L.P. v. First Fidelity Bank, N.A.</u>, 85 F.3d 970, 972 (2d Cir. 1996). ("[g]enerally, the right to adequate

protection allows a secured creditor or its representative to propose a method of protecting its interest against the diminution in value of the security during a bankruptcy proceeding."). Section 361 states, in pertinent part, that when "adequate protection" of an entity's interest in property is required under Section 363, such adequate protection may be provided by:

(1) requiring the [debtor-in-possession] to make a cash payment or periodic cash payments to such entity, to the extent that the … use, sale, or lease under section 363 of this title ... results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such ... use, sale [or] lease ... results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

26. The concept of adequate protection in the context of a proposed use of cash collateral is intended to be flexible, especially in the formative stages of a chapter 11 case, and must take into account the interests of the other creditors of the estate. In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987)

27. Provision of a replacement lien in property equal to the value of the cash collateral used specifically complies with section 361(2) and provides adequate protection within the meaning of section 363(e) of the Bankruptcy Code where the debtor in possession is using cash collateral to generate new inventory and accounts or is operating profitably in the

14

postpetition period. In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 716 (Bankr. D. Del. 1996); In re Dynaco Corp., 162.B.R. 389, 393-95, 25 ( Bankr. D.N.H. 1993); In re T.H.B. Corp., 85 B.R. 192, 195, (Bankr. D. Mass. 1988).

28. The Debtors respectfully submit that pursuant to section 361(2) of the Bankruptcy Code, the Replacement Liens granted to TD constitute adequate protection for the Debtors' use of Cash Collateral. As provided in the Budget, the Debtors are cash flow positive and are not expected to suffer a diminution of assets postpetition. As a result, the Replacement Liens provide a more than adequate equity cushion to protect TD's interests. Therefore, the Replacement Liens provide TD with adequate protection of its interests for the Debtors' use of cash collateral. The additional granting of the superpriority administrative expense claim further establishes that TD is adequately protected.

29. An additional form of adequate protection is provided by the existence of the third-party guarantees of the TD Prepetition Indebtedness that were provided by non-debtors, Elizabeth A. Rubino, Brian M. Rubino and VHR Development, LLC. See In re Lombardo's Ravioli Kitchen, 2009 WL 585814, at *4-5 (Bankr. D. Conn. Feb. 20, 2009).

30. For the reasons set forth herein, the Debtors submit that, under all of the circumstances of these cases, the interests of TD are adequately protected for the Debtors' use of the cash collateral subject to the Interim Order. Thus, approval of the relief requested herein will allow the Debtors to pursue a reorganization of their businesses, thereby maximizing value for their creditors without harming or prejudicing the rights or interests of TD.

## NOTICE AND PRIOR APPLICATIONS

31. On December 16, 2014,, the Debtors served a copy of this Motion, with all attachments, along with a Notice of Interim Hearing on the Motion, by facsimile or overnight

15

mail, upon (i) the Office of the United States Trustee, (ii) counsel for TD and (iii) the creditors listed on the Debtors' lists of the 20 largest unsecured claims against the Debtors (the "Notice Parties"). Upon entry of the Interim Order, the Debtors shall promptly mail executed copies of the Interim Order to the Notice Parties. In light of the nature of the relief requested herein, the Debtors submit that no further notice of the Motion is necessary or required.

32. No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court issue and enter the attached Interim Order and a Final Order granting this Motion, and grant such other and further relief as the Court may deem just and proper.

Dated at:  Bridgeport, Connecticut          ULTIMATE NUTRITION, INC. AND
           December 17, 2014                 PROSTAR, INC., DEBTORS AND
                                             DEBTORS IN POSSESSION

                                    By:   /s/Irve J. Goldman
                                          Irve J. Goldman (ct02404)
                                          Jessica Grossarth (ct23975)
                                          Pullman & Comley, LLC
                                          850 Main Street, P.O. Box 7006
                                          Bridgeport, CT  06601-7006
                                          203 330 2000 Fax: 203 576 8888
                                          igoldman@pullcom.com
                                          Proposed Attorneys for the Debtors